The next case is No. 155084, REOFORCE, Inc. v. United States, Mr. Stevens. May it please the Court. October 1994, Congress decides to give land to the State of California, and the State of California says it doesn't want the land if there are federal mining claims,  In August of 1995, BLM decides how it's going to deal with mining claims on this land, and it's very important because BLM is responsible for determining whether the claims are valid or not, and because a mining claim that is operational is more likely to have evidence of validity, because validity depends upon is it economic, is it a valuable deposit, and if you're in operation, you're presumably valid. So therefore, it was important, and in fact, in the MOU, says it was necessary to suspend plans of operations that have been approved but are not yet operational. How much weight do you put on the settlement agreement? Because they argue that when the dispute is finally settled with BLM, that then there was a time period of activity which didn't take place, and that's a very simple way of looking at it. Does that not fit with your argument? Well, the problem with that is, and that was apparently the basis of the trial court's decision on standing. Yes. Whatever it is as to how it came out and who won and lost. And the problem with it is that my client was engaging in mining activity pursuant to the settlement agreement, but there was not evidence presented on that because that was never raised before, and in fact, we went to trial based on Judge Futte's ruling on summary judgment that we, in fact, did have a property interest. And this was never raised before. There was not evidence about mining that happened post-settlement agreement because our position was the critical question is you need to own a property interest at the time of the taking and not at the time of filing suit. And the federal government has essentially agreed that Judge Braden got that question wrong in the final decision. So, again, we think the focus is what is the time period in which Rio Forest was stopped from mining, which was 1995 to 2008, and when the temporary taking ended in 2008 with the settlement agreement, it really doesn't matter what happened after that. I want to talk to you about that memorandum of understanding, which you were about to talk about. So I understand that Judge Braden has said that it did not effectively deprive Rio Forest of any right. I was just wondering, what do you think the standard of review is that applies to her reading of the memorandum of understanding? Well, I would normally say it's a clearly erroneous standard because it is a question of fact. It is based upon essentially these written documents and the written statements and oral statements as well. We're arguing that multiple BLM officials at multiple levels on multiple times said Rio Forest could not mine until the valid existing rights determination was made. And there is no evidence that these officials weren't authorized to speak or that there was some other reason that Rio Forest should not have trusted what was said over and over and over and over. That was 10 years later, though, right? That was like in the 2003, 2004, 2005 era. And what we're trying to figure out is what did the MOU in 1995 do to Rio Forest, if anything? And so when we look again at the facts on the ground in that time zone, we see that there was a letter from BLM to Rio Forest just three weeks before the MOU came out stating that there's an MOU coming. It's not going to affect you, Rio Forest. You will be able to keep doing what you have been doing under your approved plan of operation. And then when we look at the actual MOU, we see that there are a few different groups. One is for people with plans for exploration activities, and there's other people that have plans for operating mines. And your POO from the late 80s and early 90s was authorizing you to mine 200,000 tons annually. So it looks like to me that you had a clear lane of being a full-blown operating mine. Whether you chose to actually go to the limit of 200,000 tons or not is completely up to you. But I don't see how we can regard you as being approved merely for exploring. So I have two responses. One deals with the July 1995 letter. And again, as we've indicated in our briefs, that we've objected to the letter because we never received it. It's an unsigned letter. It's not even on letterhead. But I think more importantly is that that letter was talking about what was expected in an MOU, and it could not describe what the MOU actually said because the MOU was not in existence. And we provided the trial court with all of the draft MOUs at the time that indicate there was never a discussion about suspending plans of operations. And I think it's also important to look at Appendix 1100. There's a communication from Lynn Gumm in the BLM office who was the purported author of this letter, and he says Rio Force was told in July of 1995 that it could not mine until a validity exam was done. What about these different things, meeting minutes from Rio Force's board that show that in 1995 there was a discussion of plans to extract approximately 200 more tons of product in 1996? I mean, so how does that factor into it? That seems to be evidence that supports the determination below that the memorandum of understanding did not prohibit Rio Force's mining activities. So the meeting minutes of the BLM Corporation indicate that they anticipated that they were going to be mining. Nobody understood. There's no evidence to indicate that somebody should have known this was going to last 13 years or 10 years or 9 years or 8 years. When there was a validity exam done before, it took less than 2 years. When there was one done on the common, uncommon variety, that was done in 87, done in 89. There was no understanding that this was going to be a long, drawn-out process, and it only made sense that Rio Force would continue to plan, continue to get permits, continue to do marketing, and to do the same. Would you agree that some plans of operation on their face are for mining, whereas others are for exploration? Absolutely not, and in fact the BLM witness on that point was questioned at trial extensively on that, and he said there are not different plans for exploration. That is cited in our brief. It was a testimony of Rob Waywood. According to the regulations, it seems to use the words exploration and mining separately as meaning different things. Do you agree with that? Are there terms of art that have different meanings? Exploration is just one part of the concept of mining. I mean, I would agree that mining includes a lot of different things. And what's critical, and getting back to your other point about the MOU and talking about exploration, is that it says what we mean is not producing mines. Group 2 was for non-producing mines. And again, I just cited the Appendix 1100 where in 1995, Rio Force was told that it couldn't be in production without a validity examination, and there were communications all the way through this time period that concluded that Rio Force was in Group 2, that it could not commence mining until a VER was done. When you say communications all the way through this time period, that informed Rio Force that it could not do any further mining from 1995 until there was a validity determination, what are you pointing at? Because I only saw a series of internal messages being sent inside of BLM, eight, nine years after the fact. And then maybe one letter in 2003 or 2004 from BLM to, I believe it was Simonson, suggesting something to that effect. But I didn't see anything in 1995, 1996, 1997, 1998, 1999. So again, I just mentioned the July 1995 communication. There was the MOU itself that was given to everybody. Right, but the July 1995 communication on its face doesn't say you can't do any more mining until after you get a validity determination. It says the opposite of that, that you will be able to keep going as hard as you want up to the limit until, and then when we get a validity determination, we'll go from there. I'm sorry, I'm referring to Appendix 1100, which is a different document in which BLM officials say we told Mr. Simonson in July of 1995. Right, but what date is that communication that you're referring to? It's July of 1995. No, no, the communication you're saying that BLM official says that we told Simonson in July of 1995. Oh, you're right, that is subsequent. Yeah, when? Yes, I don't remember. I think it's like 2004, something far later. 2006. 2006. Yes. So that's the point I'm trying to make. You're right that there are some communications a decade later where BLM seems to be under the impression at that time that perhaps Simonson hasn't been mining for the past ten years because BLM put Simonson into suspension until it got a validity determination, but when you look at the 1995 era itself, as we already talked about the July of 1995 letter, which I think speaks for itself, we look at the MOU and there's maybe a reading that supports you and says, well, they weren't really producing that much so maybe it's Group 2. And then you look at Group 3 and you see, okay, these are people that have approved operating plans and so therefore Simonson looks more like Group 3. And then you look at Simonson's group's activities in 1996 and 1997 where they're running around everywhere trying to find investors, trying to find buyers, not really finding anybody, but they were actively looking at that present time to sell. They weren't talking about, well, as soon as we get our validity determination, then we can sell. They were looking for buyers right then and there. They were looking for people to invest with them right then and there. And they just weren't really getting anywhere is what I seem to be seeing. And then things kind of go dormant for quite a period of time when it comes from, whether it's Simonson or other players that were kind of moving in and out. And then it's really only 2003 where Simonson kind of all of a sudden now is interested in pursuing a validity determination. So, Your Honor, there's never been anyone to suggest that Simonson really was in Group 3. I mean, all of the communications are consistent that he was in Group 2. Again, those are the ones from a decade later. Yes. Okay. Absolutely. That's fine. We're talking about, you know, maybe the record is mixed here and we have to figure out, was it clearly erroneous for the lower court to conclude that what happened with Rio Force was that the government actually had intervened and stopped Rio Force from doing something in 1995. And she made a finding that, no, it wasn't that case. In August of 1995, if Rio Force, on notice of that MOU, that a VER had to be done, it would be running the risk of committing mineral trespass. And so it did not. I realize. What about the, I'm sorry, what about the Samara Reclamation Project approval that you needed from the State of California? Yes. In order to do any mining after the MOU, did you need that Samara approval? It's complicated because the Samara requirement for an approval is only if you are disturbing an acre or more of the surface. And this is an underground mine. And so there was a determination that, no, you don't need one. And then later they came back and remeasured and said, oh, now you do. And so Rio Force got that. Because my understanding was in November of 1995, you got a letter from BLM saying, you're going to need to get this Samara approval. Yes. Because you're more than the acre and a half or whatever it is. Yes. And so go to California and get your Samara approval. That's right. It was always more than an acre, was it not? I didn't get the impression that that was under dispute. No, it wasn't under dispute. There is evidence in the record that from California they said, you don't need a Samara permit. And there is that document. And then that was remeasured and then changed. So I don't understand why it took until 2003 for this group to wait until getting the Samara approval. Well, one, it took some time. Again, we're talking over five years later of waiting for the validity exam. And it just took some time to get that done because it did not seem like anything. They hadn't even started the validity exam at that point. Had you made any requests before 2003 to either ask for a Samara approval or for a validity determination? I believe it started in 2001, but I don't have that right on the tip of my tongue. Thank you. Mr. Stevens, we'll save you rebuttal time. Thank you, Your Honor. Let's hear from the government. Mr. Bielert. Good morning. May it please the Court. My name is Jeff Bielert. I am joined today by Matt Marinelli from the Department of Justice and Lauren Bachtel from Interior. We're here on behalf of the United States. I'd like to focus on what exactly Rio Force was told in 1995 because I think Judge Chen is on to something here. There were three letters. We discussed this in our brief. The first letter is a very specific letter. It's addressed to Mr. Simonson, and it says there's going to be this memorandum. It's coming out. You are allowed to continue operating under your approved plan of operations. Three weeks later, he gets another letter. It's a generic letter. It's sent to all possible mining claimants in the land that's going to be withdrawn and transferred to the State of California. That letter is, as it says in its purpose, it puts forth its agreement between the State of California and the federal government. It doesn't apply specifically to any particular mining claimant. It's just a generic letter letting them know what's going to be happening. That's then followed up with another letter in November of 1995 where the Bureau of Land Management, again, sends a specific letter to Mr. Simonson saying, under your approved plan of operations, you are disturbing a certain amount of ground. In order for you to mine, you need to get these SMARA permits from the State of California. Had the Bureau understood the memorandum that it had signed with the State of California to operate as some way of suspending Mr. Simonson and Rio Force's mining claims, why would it send another letter saying that they need to get this certification? There's no mention of suspension in there. In fact, the trial court, when it looked at all the evidence that was submitted, it pointed to these letters, but it also pointed to the meeting minutes. When you look at the meeting minutes, there's a bunch of them that were put into the record. None of those meeting minutes suggest anything was ever discussed among the shareholders that mining operations had been suspended. In fact, as the court pointed out, the meeting minutes suggested they were trying to mine even more pumice site. Why didn't they mine the pumice site? They couldn't find buyers. No one wanted to buy that. That's in their meeting minutes. They also received a report from, I think it was one of their shareholders. It told the board, Rio Force can continue to mine because the Bureau is satisfied we can operate under our approved plan of operations. The trial court did exactly what it was supposed to do in this case. It submitted a bunch of evidence. Rio Force brought evidence of internal discussions that occurred, as Judge Chen pointed out, a decade later. These are internal emails within the Bureau. It's true that some of those suggest that there had been these communications. But the point is, when you look at them, when you go into the record, and I'd like to start with Appendix 1100, Rio Force is mentioning it here today, talking about how they were informed in July of 1995. This is Joe Gum. That was a 2006 email. He's summarizing something that he communicated in July of 1995. You don't need to rely on that. Go to the actual letter that was sent to Rio Force. That's at Appendix 992-993. That letter is the July 1995 letter. You don't need a 2006 email. But that letter, you're saying the July 1995 letter, not the memorandum of understanding. Correct. Why do you think he says here, though, that they need to conduct a validity exam before initiating operations? There's some confusion here, and I want to be clear. In 1998, we talk about how the Fogan Group took over Rio Force, and there is evidence. There was an inspection that was done by a geologist. It was conducted. The Fogan Group submitted a new plan of operations that was different from the 97 and the 92 plan that allowed them to get 200,000 tons of pumicite per year. When they saw, and this is at the Appendix 1012 to page 1024, the Fogan Group, what they did is they submitted a new plan of operations. A geologist shows up, goes out there, realizes this is land that's being withdrawn. It's already been withdrawn from the operation and mining laws. You cannot mine. You cannot have a new plan of operations that would be approved unless you get a validity determination. So it's true. The geologist writes that. Mining cannot continue until you get a plan of operations. That's accurate. That's under the new plan of operations. Is it your position and the Department of Interior's position that if Fogan in 97, 98 decided, well, I'm just going to walk onto these lands that have an approved plan of operation dating back to the early 1990s and do precisely what Simonson had been authorized to do back then, I'm going to be free and clear and don't have to worry about any encumbrance from the 1995 MOU? Is that your position? Assuming that he complied with – assuming that the Fogan Group at the time complied with all the regulations. So, yes, if you had the right permits from the state of California, which Your Honor is absolutely correct, they didn't have. They didn't have them in 95. They certainly didn't have them in 1998. It wasn't really until 2003 that they sort of got their act together. Is it your understanding you have to have the Samara approval after 1995 before they could continue with their approved plan of operation? And that's reflected in the record. That's the November 95 letter. That's the letter sent from the Bureau to Mr. Simonson saying you've got this approved plan of operations in existence. In order for you to mine, you need to get the right approval, the Samara approval, the reclamation approval from the state of California, if you're going to mine under your approved plan of operations. But to just get back to Fogan, your view is that Fogan got tripped up because he applied for a new plan of operation. And if he had just adhered to the preexisting plan of operation from the early 1990s, he wouldn't have had any problems. That's correct, Your Honor, assuming, again, that he had complied with all the other requirements to mine. That was an approved plan of operations. And this is going to the settlement agreement. I mean, take a look at the settlement agreement. The trial court looked at the settlement agreement and called it a validity determination. It's no such thing. The settlement agreement at the contest proceeding between the parties, when you look at it, there is no mention. In fact, the trial court recognized it, says it is silent as to whether this was a validity determination. It was silent as to whether there were any property interests or that it had somehow recognized that Simonson or Rio Force had a property interest. What the settlement agreement said was you had an existing plan of operations. That existing plan of operations predated the withdrawal. Under that existing approved plan of operations, we are going to allow you to mine three of the mining claims that are at issue in this contest proceeding. And, oh, by the way, here are these four conditions that we're going to set forth that you have to comply with in order to mine on these mining claims. There's a bit of a tricky question here on whether or not Rio Force has a compensable property interest here. And you dispute that. Does the court need to first address and resolve whether there's a compensable property interest if, hypothetically, the court were to conclude that even if there was one, there wasn't anything in the 1995 MOU that could be regarded as an interference of that compensable property interest? There's absolutely nothing preventing the court from saying, we can take our argument, no, there is no compensable property interest. Therefore, we're done. Or let's just go ahead and assume that there is a compensable property interest under Penn Central under all the three factors. They cannot satisfy that there was a regulatory taking here. So, yes, the court can do this. And the court has done this, I think, recently, the Chittenden case that came out last week. This court, it was an unpublished decision, but it basically says, we're just going to assume that there was a valid existing mining right or that there was a property interest. And it was still OK to dismiss the case. And I think that that's perfectly acceptable here. The court does not need to find first that there was. It can just assume that there was and then go and address the Penn Central factors. Why isn't Judge Futte's summary judgment opinion that there was a compensable property interest with respect to the three mining claims that you allowed to go forward under the settlement agreement? Why isn't what he said there persuasive? Well, I think that he's misunderstood. I guess the whole point of the settlement was to grant RioForce the recognition from the government that it was free and clear to go ahead and do mining. I mean, without saying the words valid claim, in effect, that's what it is. I mean, it would seem peculiar to have this settlement agreement and then nevertheless force RioForce to then undertake a brand new proceeding to figure out whether what it has been granted is, in fact, a valid grant. Well, and if you look at the settlement agreement, one of the things that they give up is the ability to patent that mining claim. And so I thought all patents were under moratorium already. That might be correct. I don't know what was going on at the time. I'd have to go back and look at that. But under the terms of the settlement agreement, all I'm pointing out, though, is if, in fact, the settlement agreement is read to be a valid determination and to say that you have a compensable property interest, we, the government, cannot put those conditions on those mining claims. So we can't come in and say, oh, you have a valid compensable property interest and, oh, by the way, if you don't mine in two years, we're taking that from you. Had that really been a valid – had that been a recognition of a compensable property interest, we couldn't have put that condition on their mining operations. I hear what you're saying. But also the agreement says that all disputes between the parties have been resolved, and the whole dispute between the party was validity, right? That's correct, Your Honor. And it's also correct that – and you can look at Best, you can look at Cameron – the Department of the Interior has an ongoing responsibility. This land is still fee simple land that the government owns. Validity is – you can have a valid claim at one point, and it's not the case here, but you could have a case where the government goes through the process. There's a valid determination that's made. The mining claim continues to mine on that, and years later they file for a patent. It may very well be that the market has changed conditions. Who knows? And then it's now at the time of the patent, an invalid claim. The government can go through that process up until the point of patent, and if conditions have changed, it's not a one-time thing that says, okay, you've got a valid determination as of this date, therefore for the foreseeable future you will always have a valid claim. That's not accurate. In the validity determination, what we did in that contest proceeding, the settlement agreement says the government is no longer going to contest the validity of these mining claims. That's what the settlement agreement says. We are dismissing. We're resolving this particular contest proceeding. There's nothing in the settlement agreement that says we recognize that you have value. Do I remember correctly, though, that if there isn't a valid claim, the land goes to California? Well, yes, Your Honor. That's true, and you can look at the regulations, and we cite this in our brief, and we explain that as of the withdrawal in 1995, and we cite our handbook. We cite the regulations that allowed if you had an existing approved plan of operations that predates that withdrawal, you can mine under that plan of operations, and that's exactly what the government did here. The government looked at this, and they said, okay, you've got this contest proceeding. You've agreed to dismiss the contest as to 20 of the claims. We're going to allow three of them to go forward. Oh, by the way, one of those claims didn't even have an exposed pumice site, so under the mining law, that's not valid per se. If it's not even exposed pumice site, so it's not like we're recognizing a validity determination. All we're saying is go ahead and mine on those three claims under these conditions. You have two years. I still don't hear the government arguing that that settlement agreement extinguished all of the claims and all of the conditions and all of the debate until the settlement, and although it's mentioned, it's almost as a throwaway. Your opponent says it related only to standing. Well, I think there was more to it, but there was the 24-month condition, which I gather was not met, but I don't hear you argue that this is what the issue seems to be. The settlement really actually was a settlement of all of this back and forth, was it not? It was certainly a settlement of the contest proceeding, and I admit that the government gave up its right to continue to challenge the validity, but at the end of the day, what the trial court did, and Rio Force is correct on this, that we did not argue below. You did not mine in that 24-month period. Therefore, you have no claim. They're correct to point out that that was submitted. So the government is waiving that question? I'm not saying that we're waiving that question. I think that if you look at the terms of the settlement agreement, what it says is- Well, it's mysterious to look at it, and yet to see nothing but silence when it seems to be could be taken as a direct resolution. There was post-trial. I mean, they put this in on the reconsideration motion. Rio Force comes forward with an affidavit saying, oh, here's what we did to comply. It may well be that we contest some of the things that they're claiming in terms of what they were doing. It's too late to contest it, is it not? Well, I think what the settlement agreement contemplates is that you would then have to enforce the terms, that we would bring it back to- and I have to go back and look at this- but that we would then have to bring some sort of action to oust them of their right, of what we think, if we're going to dispute what was going on. But this was a regulatory takings claim brought in the Court of Federal Claims, so I'm not sure that it was- had we not addressed it then, that we somehow lost the ability to address that later. I think if Rio Force prevails here and the settlement agreement is still in place, they still have to abide by those requirements, if they're going to mine on those claims. And we would still have the right to come in and say, you weren't mining over a 12-month period or any of the requirements. Or it's limited to, I think, a 10-year period, then another 10-year period, whatever. If they don't abide by that, then yes, we would come in and they would lose their ability to mine. Can I ask you a hypothetical? Yes. It may or may not relate to this case, but I just want to understand your understanding of takings law. If someone has an approved plan of operations to do some mining, and then the government says, stop. You can't do any more mining until there's a validity determination. And then the government doesn't do a validity determination for 20 years. And then it ultimately concludes, yes, it's a valid claim. Would you agree that there was a taking, a regulatory taking for those 20 years, assuming economic injury and investment expectations and all of that? Potentially, Your Honor. But I'd like to flag one thing, and that is, from the point at which they understand they're affecting their rights, they need to bring suit. If the government comes forward and says, stop mining, within six years for the statute of limitations, they need to bring that takings claim. And if they wait 20 years for something that's supposed to happen, then they've lost the ability to bring that claim. And that's reflected in the Navajo Nation case that we cited. Temporary taking is treated exactly like a permanent taking. You're on notice. And here, these claimants, Mr. Simonson and Mr. Stain, his shareholder, as of 1995, when they alleged this supposedly happened, two years later they transferred all of their interests to their company, RealForce. In 1997, they were on notice. They didn't have rights anymore. It was all in RealForce. They should have brought their takings claim six years after 1997. They didn't do that here. And as we talk about it later on in the investment-backed expectation. You're not saying the statute started to run because they restructured their corporate structure. No. What I'm saying, Your Honor, is the statute started to run when they knew the individuals. The individuals knew exactly how their property rights had been affected because they transferred it to RealForce in 1997. They knew. They alleged. You can look at their complaint. They alleged. The memorandum, under their understanding and their reading of this, it prohibited them from mining. They no longer had an interest. If they're going to bring some sort of takings claim, they need to bring it at that time. Because they understood that their rights, they've been prohibited from mining. They need to bring it within that six-year statute of limitations. And I get that from the Navajo Nation case that we cite. When your rights are affected, you have a duty to bring your claim. They didn't do that here. RealForce, to the extent that it does have a claim, RealForce took its interest in this property with the full knowledge, under their reading of the memorandum, that a taking had already occurred. There's no way that RealForce can establish any reasonable investment-backed expectations. And there's no way that it can establish economic interest. And I'll point the Court's attention to the mining expert, Mr. Springer, Appendix 244 to 259. He talks about all the work that RealForce had not done in order to establish that. I see my time has expired. I ask that the Court affirm. You have more questions? Thank you. Thank you, Your Honor. Thank you, Mr. Buehler. Mr. Stevens? Thank you, Your Honor. I'd like to deal with Judge Newman's questions first about the 24-month period and the significance of that. Yeah. So our takings claim is that it was a temporary taking from 1995 to 2008. And if RealForce had not started mining by 2010, then it would at that point have no property interest. But that was irrelevant to our claim. Our claim is in the 1995 to 2008 period was a temporary taking, and that is the only time period. And that's where you encounter the statute of limitations issue then. Well, so, Your Honor, we rely on what Judge Foute ruled, which was that in 1995 the claim was not right. Yes, the taking started, but the taking claim could not have been brought. And Judge Foute relied on the Supreme Court decision in First English Evangelical Lutheran Church, which makes that clear. The interference which can cause the taking can start earlier, and compensation has to be paid from that earlier point in time. But the claim itself in going into court may not be ripe until later. And it was not ripe in this case because it was unclear what RealForce would have been able to do, what it could mine, whether it even owned the claims. And I think the policy of rightness is furthered in this case because the claim was narrowed from 23 mining claims down to three. And so I think Judge Foute's decision was right. The claim was not ripe until later, even though the interference which started the taking started in 1995. And I think back to that 1995 question, I think it's important to remember that RealForce got this memorandum of understanding and a letter was sent saying this is the new plan. And RealForce, I think it's only reasonable that it relied upon that plan, knew that it was not a producing mine, knew that there's not separate kinds of plans of operations for exploration. And this is corroborated, even though it may be 10 years later or years later, there's never been anybody saying you can mine until after this case was brought. There was nobody in the 1995 era that told Mr. Simonsen you cannot mine. Just the MOU itself. The MOU itself and the letter to him tells him. And as I mentioned before, to simply ignore that is to run the risk of a mineral trespass. And so I think to come back later and say, well, you really could have mined, is doing a disservice to a citizen. And again, I want to say about the July 1995 letter, I mean, our contentions in the trial court is it was never received. As far as we know, it was never mailed. It was not signed. It's not even on BLM letterhead. As far as we know, it's a draft letter. But we had no knowledge of it until Mr. Simonsen actually did some FOIA requests and learned about it after the mineral report came out saying that the BLM's position is that claims were not valid. As to the idea that RioForce took notice of the taking when it acquired it from its stockholders, I think that runs straight contrary to the Supreme Court's decision in Palazzolo that having notice of the regulation is not determinative of no reasonable investment-backed expectations. And even doubly so in the context of this case. Because what they took notice of was that there was a suspension until a VER was done. This is not the case, as in Palazzolo or in other cases where people have noticed that some permanent regulation, say a wetland regulation, is never going to let you develop the property. Do you want to talk about the Penn Central factors? Well, I'll do so very, very quickly. Judge Brayden indicated there's no economic impact because RioForce was years from actually getting into production. And our position is whether the ramp-up time was two years as we contended or four or eight, RioForce still lost 13 years. It's all just been set back and that still has an economic impact considering it involved a half a million dollars investment and a decade of a man's life. As to reasonable investment-backed expectations, I would say it is confirmed by the fact that multiple mining companies were wanting to either buy the deposit or go into a joint venture. With that, I see my time is up. Thank you. Thank you both. The case is taken under submission.